FILED
9/22/2025
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of J.S. | No. 86906-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — J.S. challenges a superior court commissioner's order committing her to 14 days of involuntary detention pursuant to the involuntary treatment act (ITA), ch. 71.05 RCW. She raises two main issues. First, J.S. claims that the commissioner erred by failing to grant a motion to dismiss (Motion), which argued that the designated crisis responder (DCR) who petitioned for her initial detention had "totally disregarded" certain requirements of the ITA. She also argues that there was not substantial evidence in the record to support the commissioner's finding that she was "gravely disabled." Disagreeing, we affirm.

## I. BACKGROUND

On June 21, 2024, J.S. arrived at the emergency department of a hospital with chest pain. A hospital social worker examined J.S., who disclosed that she

had intentionally overdosed one day prior. During this examination, J.S. also stated that she believed she was being stalked, that she had experienced auditory hallucinations which told "her terrible things," and that she had recently slept poorly due to hearing people "talking to her." J.S. refused voluntary treatment. Hospital personnel then referred her, pursuant to the ITA, to a DCR to be examined.

The DCR noted inter alia that J.S. suffered from auditory hallucinations and "paranoid, persecutory delusions." The DCR also reviewed J.S.'s medical records, which indicated that she had "presented to three local emergency departments within [the preceding] 48-hour period"—the last of which was her visit to the present hospital. Pursuant to the DCR's initial petition, J.S. was held, under RCW 71.05.150, for several days and transferred to Telecare North Sound for psychiatric treatment.

On June 25, 2024, two medical professionals at Telecare North Sound timely petitioned the superior court for J.S. to be held for up to 14 days of further involuntary treatment. They asserted J.S. "continue[d] to present with hyperverbal speech, persecutory, paranoid and illogical thinking, [and] impaired insight and judgment."

The next day, the commissioner held a hearing on the petition and on J.S.'s subsequent Motion, which argued that the DCR had totally disregarded portions of RCW 71.05.154. The commissioner denied the Motion and heard testimony on the merits of three witnesses: J.S.'s mother, Joann Clemo, who was a social worker who treated J.S. at Telecare North Sound, and J.S.

At the end of the hearing, the commissioner found that J.S. was gravely

disabled under RCW 71.05.020.  The commissioner incorporated their oral findings into their ultimate written order, memorializing the same findings.

J.S. timely appeals.

## II.     ANALYSIS[1]

### A.     "Total Disregard" of the ITA

J.S. claims the commissioner erred when, in denying her Motion, they concluded that the DCR sufficiently complied with RCW 71.05.154.

RCW 71.05.154 sets out requirements for a DCR to follow when assessing a person located in an emergency room at the time of an ITA evaluation.  It states the DCR "shall take serious consideration of observations and opinions by an examining emergency room physician, advanced registered nurse practitioner, or physician assistant in determining whether detention under this chapter is appropriate."  RCW 71.05.154.  It continues, "The designated crisis responder must document his or her consultation with this professional, if the professional is available, or his or her review of the professional's written observations or opinions *regarding whether detention of the person is appropriate*."  *Id.* (emphasis added).

Separately, RCW 71.05.010 provides that, "[w]hen construing the requirements of this chapter the court must focus on the merits of the petition, except where requirements have been totally disregarded."  The ITA does not further define "total disregard." *See* RCW 71.050.020 (definitions); *see also In re Det. of A.C.*, 1 Wn.3d 731, 744, 533 P.3d 81 (2023).

---

[1] The parties agree that this appeal is not moot because a record of a prior involuntary detention "carries collateral consequences."  We accept that agreement and address the entirety of her appeal.

Our Supreme Court has accorded meaning to that term from dictionary definitions, holding that the word "[t]otally is defined . . . as in a total manner: to a total or complete degree." *A.C.*, 1 Wn.3d at 744 (quoting MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/totally (last visited June 16, 2023)). And the Court held that the word "[d]isregard is defined as to pay no attention to: to treat as unworthy of regard or notice[.]" *Id.* at 744-45 (quoting MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/disregard (last visited June 16, 2023)).

Our Supreme Court further instructed that reviewing courts "must consider the totality of the circumstances in determining whether the requirements of the [involuntary treatment] act have been totally disregarded." *Id.* at 747. The mere fact that "some aspect of the act has been violated" is not, in every case, sufficient to show that that the "requirements of the ITA [have been] totally disregarded." *Id.* at 745.

The question of "when and whether dismissal is required when the ITA has been violated" is a question of law which we review de novo. *Id.* at 739. But we review whether a trial court properly applied the law to given facts for abuse of discretion. *Id.* More specifically, "[w]e review the superior court's total disregard determination for abuse of discretion." *In re Det. of E.S.*, 22 Wn. App. 2d 161, 185, 509 P.3d 871 (2022).

We find an abuse of discretion when the trial court decision is manifestly unreasonable or exercised on untenable ground or for untenable reasons. *In re Det. of D.H.*, 1 Wn.3d 764, 774, 533 P.3d 97 (2023). This includes a decision that

is reached by applying the wrong legal standard, *id.*, or discretion that is exercised on a misunderstanding of the law, *A.C.*, 1 Wn.3d at 740.

Here, the DCR's petition attests that she conducted a review of J.S.'s recent treatment history, including notes of the professionals who had examined her in the preceding days. In addition to notes from two examining social workers, her medical file included notes from a physician assistant (PA)—one of the medical professionals enumerated in RCW 71.05.154—which indicated J.S. had refused treatment and "grew hostile when asked about her medical history."

J.S. contends the DCR's review of the PA's notes was insufficient to satisfy RCW 71.05.154 because the PA did not include further observations or opinions specifically regarding whether J.S.'s detention was appropriate. For its part, the State concedes that the DCR did not "perfectly" follow RCW 71.05.154, but argues that it was not an abuse of discretion for the commissioner to conclude that the DCR did not "totally disregard" its requirements. We agree.

The plain text of RCW 71.05.154 sets out two alternative documentation requirements. Only the latter is relevant here and it contains four component parts. Namely, the DCR must (i) document that (ii) they reviewed a medical professional's (iii) examination notes regarding (iv) the appropriateness of detention. RCW 71.05.154. We hold that it was not an abuse of discretion to reject the claim that the DCR "pa[id] no attention" to those requirements and not "to a total or complete degree." *A.C.*, 1 Wn.3d at 744-45.

The DCR here (i) documented that she (ii) considered the opinions of a relevant professional (iii) memorialized in the available medical records, before

5

making her detention recommendation concerning J.S. And it would not be an abuse of discretion to interpret those notes—taken by an emergency room professional less than 48 hours prior about her initial detention—pertained to J.S.'s amenability to treatment. That is, it was not manifestly unreasonable for the commissioner to conclude that J.S.'s "hostility" meant she was not amenable to treatment in an outpatient setting.

Moreover, the totality of the circumstances present at the time of the DCR's petition supports this conclusion. The PA's notes described J.S.'s condition during what was the first of three ensuing emergency hospital visits in a short duration immediately preceding her evaluation. Thus, it was not "manifestly unreasonable" for the commissioner to determine the DCR did not totally disregard RCW 71.05.154 when she reviewed J.S.'s chart and consulted notes from a physician assistant who had examined J.S., all of which regarded "whether detention [was] appropriate." RCW 71.05.154.[2]

---

[2] This court similarly held that a DCR had not totally disregarded the ITA in *In re Det. of A.V.*, No. 85686-3-I, slip op. at 15 (Wash. Ct. App. Jul. 15, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/856863.pdf, which we cite to pursuant to GR 14.1 as necessary to a reasoned decision. It is true that *A.V.* contained certain facts not present in this record; namely, that the DCR had tried to find a doctor and had testified to her usual protocol. *Id.* at 15 n.8. But we also considered it "significan[t]" that the DCR had reviewed all available hospital records associated with the patient, and that those records included notes from an emergency room professional, as occurred here. *Id.* at 11. We also note our conclusion in *In re Det. Of W.C.* is consistent with this holding. No. 82420-1-I, slip op. at 2 (Wash. Ct. App. Nov. 22, 2021) (unpublished) https://www.courts.wa.gov/opinions/pdf/824201.pdf. There, on distinguishable facts, we accepted the respondent's *concession* that appellant's counsel had rendered ineffective assistance of counsel by failing to seek dismissal of a petition for lack of compliance with RCW 71.05.154, where the crisis responder had "neither consulted with the examining medical professional *nor documented her review* of the medical professional's written observations[.]" *Id.* (emphasis added).

Our Supreme Court's decision in *A.C.* is also instructive. There, the Court consolidated three unrelated matters and held that the State had totally disregarded the ITA when it held two appellants for more than a month after orders authorizing their detention had expired. *A.C.*, 1 Wn.3d at 747. By contrast, it held that the State had not totally disregarded the ITA as to the third appellant (AC) who had never been held without lawful authority, even though it acknowledged her rights under the ITA had been "plainly violated." *Id.* In explaining its reasoning, the Court noted, "[w]e stress that on the record before us, AC was never held without authority of law. She was at all times detained either under the emergency provisions of the ITA or by court order." *Id.* at 748 n. 9.

Similarly, J.S. was never held beyond the lawful duration set out in the ITA's provisions or in a commitment order. She was, as A.C. herself was, "brought before [the superior court] on the appointed day," who then—following an independent review of the facts—"extended her detention" finding a "clear need for additional treatment." *Id.* at 748. As the Court did there, we "hold that the trial court did not abuse its discretion in denying the motion to dismiss." *Id.*

Thus, J.S.'s first assignment of error fails.

B.      Substantial Evidence for Finding Grave Disability

J.S. next claims that there was not substantial evidence before the commissioner to support its finding she was "gravely disabled" as defined in RCW 71.05.020.[3]

---

[3] As a threshold matter, J.S. asserts the court's findings were not sufficient for appellate review. We disagree, first, because she cites no authority for the

Pursuant to RCW 71.05.240, a court must hold a probable cause hearing on a petition requesting an order for up to 14 days of involuntary treatment, and it may only enter such an order if, at the conclusion of the hearing:

> the court finds *by a preponderance* of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or *is gravely disabled*, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others.

RCW 71.05.240(4)(a) (emphasis added).

The ITA further provides two independently sufficient definitions of "gravely disabled." According to the statute, the term means:

> a condition in which a person, as a result of a behavioral health disorder:
> (a) [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs or health or safety; or
> (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25).

We hold that there was substantial evidence to support the finding of grave

---

proposition that the court was required to specify in detail which facts supported which portion of the statute's alternate definitions of grave disability. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (holding that arguments unsupported by inter alia citation to pertinent authority need not be considered). As our Supreme Court has explained, the standard is that a court's findings in grave disability determinations must "at least be sufficient to indicate the factual bases for the *ultimate* conclusions." *In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986) (emphasis added). Moreover, to the extent J.S.'s challenge focuses on the sufficiency of the court's written findings, we note that "written findings may be supplemented by the trial court's oral decision or statements in the record," *id.* at 219, as occurred here, rendering the record sufficiently complete.

disability under the standard set out by RCW 71.05.020(25)(b), with regard to both of its subparts.[4]

As to the first part of the standard under RCW 71.05.020(25)(b), J.S. claims the record did not support the commissioner's findings that she "manifest[ed] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions." Notably, however, she herself acknowledges that the evidence before the commissioner included: "suicidal statements, her belief that people are trying to get and hurt her, her talking to people who are not there, her delusions about injuries to her body, her trespass from businesses, [and] the loss of her job[.]" Br. of Appellant at 60. Indeed, her mother and a social worker testified to each of these facts, and also that J.S. had disrupted sleep patterns and occasionally "wouldn't eat for two or three days."

From this evidence, the commissioner inferred that J.S. had suffered a deterioration in routine functioning, including specifically, poor sleep and eating patterns, the loss of her livelihood and social circle, and the debilitating preoccupation of "see[ing] and talk[ing] to people that weren't there[.]"

In response, J.S. appears to argue that the evidence did not show a loss of control that was sufficiently *recent* or *significant*. However, J.S. cites no case in support of the proposition that a rational person could not conclude newfound symptoms within an eight-month period—which again included suicidal ideations—does not represent a loss of control that is "recent" or "significant."

---

[4] Because 71.05.020(25) sets out two equally valid bases for finding a person gravely disabled, we need not additionally assess the extent of the evidence in the record of grave disability according to 71.05.020(25)(a).

*DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

We hold that there *was* a sufficient basis for a rational person to conclude it was more likely than not that J.S. manifested severe deterioration in routine functioning evidenced by sufficiently significant and recent repeated and escalating loss of cognitive or volitional control over her actions, so as to support the commissioner's grave disability finding.

As to the second portion of RCW 71.05.020(25)(b), which requires evidence she "[was] not receiving such care as is essential for his or her health or safety," J.S. claims the commissioner found only that detention would be beneficial, rather than essential*.* She is correct that a court may not order involuntarily detention simply because an individual might benefit from treatment. *In re Det. of Labelle*, 107 Wn.2d 196, 207, 728 P.2d 138 (1986). Rather, as our Supreme Court has explained, there must be a "factual basis for concluding that [J.S.] [was] not receiving or would not receive, if released, such care as is essential for [her] health or safety." *Id.* at 208.

However, J.S. fails to establish that the record lacked evidence she would not have received care essential for her health and safety without further involuntary treatment. There is ample evidence in the record that she was not yet stabilized, was actively experiencing psychosis, and did not acknowledge any of these facts, including her diagnosis. Further, J.S. had outbursts in which she

caused herself physical injury and she herself testified that she had multiple recent interactions with law enforcement, which she could only recall as "a blur." She cites no case supporting the claim that continued treatment for someone in that situation is not "essential." *DeHeer*, 60 Wn.2d at 126.

Moreover, contrary to J.S.'s contention, our review of the record for substantial evidence is not limited to the bare assertions made in testimony because triers of fact, as the commissioner here, may draw reasonable inferences from the direct evidence. *See State v. Epefanio*, 156 Wn. App. 378, 384, 234 P.3d 253 (2010). We hold that the evidence in the record provided a basis from which a rational person could reasonably infer that it was more likely than not that J.S. would go without essential treatment outside the inpatient setting. The social worker testified that J.S. could not "provide for her essential health and safety needs" outside of the "structured setting" of inpatient treatment. And J.S.'s mother testified that she could not provide a place for her to stay upon release because she did not know whether she and her partner could care for J.S.

In short, as the commissioner summarized, there was evidence in the record demonstrating J.S.'s "lack of insight and illogical thinking," "guarded, agitat[ed]" behavior, and an "inability or unwillingness to participate in conversations about her treatment[.]" In turn, we hold that it was a reasonable inference to conclude that J.S.'s capacity to comply with ongoing outpatient psychiatric treatment was dubious.

Thus, J.S.'s second assignment of error fails.

III.    <u>CONCLUSION</u>

We affirm.

Díaz, J.

WE CONCUR:

, ACJ